IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

EDWARD SEALS, JR.                                                    PLAINTIFF

V.                                    CIVIL ACTION NO. 3:13-CV-74-SA-JMV

STATE OF MISSISSIPPI; BOARD OF TRUSTEES
OF STATE OF MISSISSIPPI STATE INSTITUTIONS
OF HIGHER LEARNING; UNIVERSITY OF MISSISSIPPI;
DR. DANIEL JONES, M.D., et al.                                      DEFENDANTS

## MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT

This cause comes before the Court on Defendants' Motion for Summary Judgment [55], Defendants' Motions to Strike [59] and [63], and Plaintiff's Motions to Strike [61] and [66]. Because the Court determines that Plaintiff has failed to establish a genuine dispute of material fact with regard to his due process claims as to Jones and Plaintiff's claims against the individually named faculty members are barred by qualified immunity, the Court grants judgment in favor of Defendants as to those counts of the Complaint. Because the Court finds that Plaintiff's remaining constitutional claims fail on the basis of sovereign immunity or standing, those claims are dismissed without prejudice. Having dismissed Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction of Plaintiff's remaining state-law claims and accordingly dismisses those claims without prejudice as well.

## FACTUAL AND PROCEDURAL BACKGROUND

The instant suit stems from a disagreement between Plaintiff Edward Seals, Jr. and a number of faculty and staff members at the University of Mississippi ("the University") regarding grade assignments and allegations of academic misconduct levied at Seals during his tenure at the University. Specifically, Seals filed the present action contending that Defendants

are liable under theories of due process infringement, breach of contract, and defamation. The following facts provide the backdrop for the dispute.[1]

In August 2009, Seals was admitted to the University's biology program as a transfer student, having already completed two years of course work at Coahoma Community College. At the time of Plaintiff's enrollment, he had been accepted for admission to the University of Mississippi Sally McDonnell Barksdale Honors College ("the Honors College") and the rural physicians scholarship program at the University of Mississippi Medical Center. According to Plaintiff, the physicians scholarship program would have provided approximately $120,000 toward his medical education assuming he was eventually admitted to medical school and agreed to practice in a rural area of the state. Acceptance into both of the honors programs was largely contingent on Seals' academic history and required that he maintain a high level of academic success.

Although Seals successfully graduated from the University, earning a Bachelor's of Science degree in August 2011, he was unable to maintain the requisite grade point average required for either honors program and was subsequently dismissed from both. Additionally, Seals was implicated in an alleged incident of cheating and was also accused of plagiarizing materials on several separate occasions. Those allegations resulted in a faculty member charging him with academic dishonesty. Subsequently, and according to Plaintiff, consequentially, he has since failed to gain admission to medical school. Plaintiff now attempts to contest numerous

---

[1] The Court takes time to note that Plaintiff's factual narrative submitted alongside his response to Defendants' motion for summary judgment is almost entirely devoid of detailed citations to the record. The Plaintiff is reminded that under Federal Rule of Civil Procedure 56(c)(1)(a), a party asserting that a fact is genuinely disputed must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . or other materials." See Jackson v. Cal-W Packaging Corp., 602 F.3d 374, 379-80 (5th Cir. 2010) ("We have explained that Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (citations and quotations omitted).

final grades assigned to him during his tenure at the University. Dissatisfied with those grades, Plaintiff attempts to enlist this Court to independently review the propriety of four final grades assigned by various members of the University faculty.

In order to graduate from the University as an Honors Scholar, Seals was required to write an Honor's thesis under the supervision of a thesis advisor. Seals initially asked Defendant Mika Jekabsons to serve as his advisor, and Jekabsons agreed. Plaintiff thereafter enrolled in Biological Sciences I (BISC 491) under the direction of Jekabsons. BISC 491 was a directed study class designed to introduce Seals to certain research methods that would be essential in producing his thesis. Specifically, Seals was expected to gain familiarity producing polyacrylamide gels and running samples on them. Because Jekabsons' research assistant had significant experience running such experiments, Jekabsons placed Seals under the direct guidance of his own research assistant, Dennis Huckabee.

Plaintiff's work with Huckabee progressed for the majority of the semester without major incident. According to Seals, Huckabee informed him that he "was performing the experiments fine." In the eyes of Jekabsons, however, Seals "was relying too much on [Huckabee] to perform tasks that [he] wanted him to learn." Accordingly, Jekabsons became "a little concerned that [Seals] wasn't picking up on the ability to perform the techniques independently." Jekabsons thereafter initiated contact with Seals to convey his expectations for the course.

Toward the end of the semester, Huckabee was unavailable to continue observing Seals and Jekabsons stepped in to provide instruction for the remaining sessions. Thus, Jekabsons was allowed the opportunity to directly evaluate Seals' ability to make a gel and then run samples.

Jekabsons, in reliance on both his direct observation of Plaintiff and his observation of Plaintiff's interaction with Huckabee, ultimately assigned Seals a B for the semester. Believing

his performance worthy of an A, Plaintiff exercised his ability to appeal that grade under the University's academic appeals process. As part of that process, Seals contested the grade with Jekabsons, the biology department chair, the Dean of the College of Liberal Arts, and, finally, the Office of the Provost. During the course of that proceeding, Jekabsons was asked by the biology chair to provide his reasoning for the grade. In that prepared statement, Jekabsons concluded that:

> Based upon the repeated training [Seals] received, the explicit communication of my expectations that he be able to perform these tasks independently, and my observations of his performance after being trained in the lab for about 14 weeks, I did not feel that he performed at a superior or excellent level as required for an A. The tasks set forth for [Seals], as well as my expectations, were not unreasonable, as these types of protocols are routinely taught to undergraduates in cell biology courses. I did not quantify any of these tasks in the form of a test or quiz (this is rarely, if ever done when conducting research), but, based upon my more than 20 years of lab experience, could confidently conclude that [Seals] exhibited significant deficiencies in some of the benchwork.

Seals, on the other hand, argued that the grade was unfair based on the fact that Jekabsons had failed to provide him with a syllabus and had graded him on a subjective basis. Nonetheless, the grade was affirmed at every level of the University appeal process.[2] Following the conclusion of that appeal, Jekabsons informed Seals that he could no longer serve as his thesis advisor. Seals paints the foregoing acts as constitutional violations, contending that Jekabsons "took away and infringed upon [Seals'] property interest being his grade, by not giving him a syllabus and/or by not grading him objectively."

Additionally, Seals seeks review of a C assigned for his performance in Introductory Physiology (BISC 330). That class, taught by Carol Britson, also involved a significant

---

[2] The University grade appeal procedure allows a student to appeal any grade the student perceives to be "based on prejudice, discrimination, arbitrary or capricious action, or other reasons not related to academic performance." There are five levels of review, including: the faculty member at issue, the department chair, the dean, an academic appeals committee, and the vice chancellor for academic affairs.

laboratory component. Britson delegated the direction of the lab component to her teaching assistant. The course syllabus stated that grading would be based on the students' performance in both the lecture and laboratory components of the course, and that students would be graded based on their contributions to the class, willingness to work in groups, initiative, patience, intellectual curiosity, and personal integrity. Further, the syllabus stated that students achieving 80-89% in the course would receive a B, while students achieving 70-79% would receive a C.

During the course of the semester, students could earn up to twenty-five participation points for their performance in the class. According to Britson, at some point during the semester her graduate assistant complained that several students were sleeping, texting, and talking during lab class. Britson avers that she observed similar behavior among the students and had specifically observed Plaintiff banging on the classroom door when he was late to class and the door was locked, refusing to turn in quizzes in a timely manner, and refusing to turn in his final exam after the time period had expired. Accordingly, when the graduate assistant turned in a maximum of twenty-five participation points for every student in the class, Britson nonetheless made deductions for students she had observed engaging in disruptive behaviors.

In the case of Plaintiff, Britson reduced his participation grade to a score of twenty. The reduced participation score gave Plaintiff a total score of 78.95, a C. Although Seals thereafter complained that Britson had no right to deviate from the participation grade recommended by her teaching assistant, Britson pointed out that even had Seals been given a maximum participation score, his total would still have only been a 79.25. Seals also, however, complained that he did not have an opportunity to review graded assignments that were left outside her office and that such practice should be against University policy. Seals also complained that Britson filed a report with the campus police, alleging that a certified letter sent by Seals was suspicious, but

that her report was disingenuous. Nonetheless, Seals failed to appeal Britson's assigned grade under the University policy.

Now, Seals argues that "Britson's conduct [was] an arbitrary taking of his property rights in the syllabus and the student handbook regarding grading." Further, Seals claims that he was defamed by Britson when she made "false statements regarding [Plaintiff's] grade" and suggested "to campus police that something was wrong or illegal about the mail."

Meanwhile, while continuing in his search for a thesis advisor, Seals soon after enlisted Matthew Reysen of the University's psychology department to serve as his advisor. Seals also attempts to contest one of the final grades ultimately assigned by Reysen. As his advisor, Reysen initially provided instruction for PSY 420, another directed study class in which Seals was expected to complete a literature review as the first phase of his thesis. Seals was assigned five scholarly articles and subsequently prepared a review for Reysen's evaluation. Initially finding the work to be acceptable, Seals was assigned an A in the course. The following semester, Seals was again enrolled in PSY 420 and was expected to continue his work on the thesis.

Although the reasoning is disputed, several months passed before Seals and Reysen again communicated regarding his progress on the thesis. Despite the class theoretically beginning in January, the two did not have significant dialogue until March. Seals thereafter presented Reysen with a draft literature review, the introduction to his thesis, on March 10, 2011. According to Reysen, the paper contained numerous instances of plagiarized or improperly cited material. Reysen thereafter informed Plaintiff that the paper needed significant revision before it would be acceptable. Reysen pointed out several passages which would constitute plagiarized material if ultimately submitted in the same form.

On May 1, 2011, Seals submitted a draft of his entire thesis.  Plaintiff's thesis defense was scheduled for May 5, 2011 with three faculty readers serving on his review committee.  That panel was composed of John Samonds, Associate Dean of the Honors College, Elizabeth Boerger, Assistant Professor of Psychology, and Reysen.  After reviewing the draft, Boerger, Samonds, and Reysen were in agreement that the thesis would not be approved without significant revision.  Additionally, all three detected numerous incidences of plagiarized material.  According to Samonds, he was immediately "disturbed by the apparent plagiarism." He thereafter used an internet program to determine whether the paper actually contained such plagiarized material.  The results of that scan revealed many similarities between the language of the thesis and the articles on which Plaintiff largely relied.  As Samonds stated, he then emailed Reysen and "told him that I had significant concerns about the extensive plagiarism it contained."  Boerger, on the other hand, "was shocked at what a bad paper [Seals] presented, both because of extensive plagiarism and poor content."  Based on her recollection, "I was upset when I read the paper.  It was obviously not a passing paper."

After the initial review of the draft, Samonds and Reysen debated whether they should initiate an academic dishonesty case and give Seals an F or allow him the opportunity to make revisions.  They decided to go ahead with the defense as scheduled and conduct a lengthy discussion afterward, defining plagiarism and providing suggestions for revision.  On May 5, Seals presented his thesis as planned.  The thesis was not approved, but Seals was provided an opportunity to make corrections and was given constructive criticism regarding necessary modifications.  According to Boerger, although "[t]he plagiarism in the thesis was extensive," Seals "did not seem to understand the severity of the problems with his paper."  She further asserted, "I asked [Seals] why he thought that copying so extensively from the work of others

was acceptable. He replied that he did not think anyone would read his paper that carefully." The committee left Seals with their comments, and Reysen entered an interim grade of incomplete for the course.

Afterward, Reysen emailed "almost every week after that defense, asking is there anything I can do to help; do you have any questions about anything. And [Seals] responded to all of those, I believe, saying no, he was working on it." Approximately a month later, Seals forwarded a revised draft of the thesis. Reysen testified, "I read the paper. I noticed that there was still—there was still a great deal of plagiarism present in the paper." Accordingly, Reysen informed Seals that he was no longer willing to serve as his thesis advisor. Reysen ultimately assigned Seals a D for his performance in the second semester of PSY 420, but did not initiate an academic dishonesty case. Seals contests Reysen's perception of plagiarized material in the thesis and now argues that "Reysen's conduct [was] an arbitrary taking of [Plaintiff's] property rights in the syllabus and in the student handbook regarding grading." Further, Plaintiff avers that "Reysen is also liable . . . for the defamatory and false statements that [Plaintiff] plagiarized his thesis work."

Finally, Plaintiff also attempts to rely on this Court to challenge his assigned grade for Mammalogy (BISC 350), which was taught by Richard Buchholz. Seals also enrolled in BISC 350 in the spring semester of 2011 and was assigned an F for his performance. According to Plaintiff's complaint, "Of course [Seals] objected and takes the position that he should have received at least a C."

According to Buchholz, Seals' grade in Mammalogy stemmed from the fact that he was discovered cheating on the final exam. Specifically, Buchholz testified that "there were other students taking their exams when I observed [Seals] using his cheat notes from under his shirt."

As Buchholz recalled, the incident "was reported to me by another student, and that's how I knew to watch Edward, and that's how I then observed him using the index cards." As Seals turned his final exam in, Buchholz confronted him regarding his suspicions. Buchholz further testified that after additional prodding, Seals pulled several note cards from his pocket and handed them over.

Seals, on the other hand, recalls the incident quite differently. According to Seals, the confrontation transpired as follows:

> [A]fter turning in my final exam, [Buchholz] had accused me of using note cards. And I said, "Accusing me of being—of using note cards?" And he said, "Yeah. Yes, sir, Mr. Seals, and the only reason why I didn't come and take your exam during the test time is because I don't want to—I wanted to save you the embarrassment of your friends and your classmates." And then that's when I went on to add, "Well, if I was using note cards, I mean, I would appreciate it if you would have contacted me during the test, not when it's you and I in here alone, and you are putting me up against a wall." So I proceeded to get my book bag. It was in the closet because we all have to put our book bags in the closet. And so I opened up the front of my book bag and I said, "Dr. Buchholz, this is what I would like to call study notes. I was using my study notes to study prior to the exam in the library." And then he takes them from me.

Although the logistics are disputed, it is uncontested that Buchholz did indeed confiscate a set of notecards.

Following the exchange, Seals and his parents met with Buchholz to discuss what action would be taken regarding the test. According to Seals, the parties reached an agreement that Seals would receive no credit for the exam, but would still be able to pass the overall course with a C. Buchholz, however, testified that he continued to review ungraded homework assignments for the semester and, in doing so, noted that one assignment in particular did not seem to be phrased in Plaintiff's voice. Accordingly, Buchholz ran an online scan to determine whether the

assignment contained plagiarized material. That program reported a 100% match for another source, and Buchholz considered it to be plagiarized. Similarly, Buchholz then identified yet another assignment that be believed to constitute plagiarism. Buchholz assigned Seals an F for the course and reported the alleged incidents to the University's committee for academic dishonesty. According to Seals, "[j]ust like the other professors, Buccholz's conduct [was] an arbitrary taking of his property right in the syllabus and in the student handbook regarding grading."

Seals then filed suit against the State of Mississippi, the University, the Board of Trustees of the State of Mississippi Institutions of Higher Learning ("the Board"), Daniel Jones in his official capacity as the Chancellor of the University, Jekabsons, Britson, Reysen, and Buchholz. Seals filed his complaint on July 25, 2012, averring numerous causes of action against the various Defendants. Defendants have now filed a Motion for Summary Judgment, arguing that the doctrines of sovereign immunity and qualified immunity bar Plaintiff's action.

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals both that there is no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." <u>Id.</u> at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. <u>TIG Ins. Co. v. Sedgwick James of Wash.</u>, 276 F.3d 754, 759 (5th Cir. 2002); <u>SEC v. Recile</u>, 10 F.3d 1093, 1097 (5th Cir. 1997); <u>Little</u>, 37 F.3d at 1075.

DISCUSSION AND ANALYSIS

*Claims Barred by Sovereign Immunity*

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." <u>Va. Office for Prot. & Advocacy v. Stewart</u>, — U.S. —, 131 S. Ct. 1632, 1637, 179 L. Ed. 2d 675 (2011). That privilege "has two parts: first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." <u>Meyers ex rel. Benzing v. Texas</u>, 410 F.3d 236, 240 (5th Cir. 2005) (quoting <u>Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank</u>, 527 U.S. 627, 634, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999)). When applicable, "Eleventh Amendment immunity operates like a jurisdictional bar, depriving federal courts of the power to adjudicate suits against a state." <u>Union Pac. Ry. Co. v. La. Pub. Serv. Comm'n</u>,

662 F.3d 336, 340 (5th Cir. 2011). Notably, however, a state may still be subject to suit in federal court if it "consents to suit or if Congress has clearly and validly abrogated the state's sovereign immunity." Kermode v. Univ. of Miss. Med. Ctr., 496 F. App'x 483, 487 (5th Cir. 2012) (citing Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 326 (5th Cir. 2002)).

Additionally, sovereign immunity extends to agencies of the state government and "arms of the state." Id. (citation omitted). In determining whether an agency constitutes an arm of the state, the court considers "the powers, characteristics and relationships created by state law in order to determine whether the suit is in reality one against the state." United Carolina Bank v. Bd. of Regents of Stephen F. Austin State Univ., 665 F.2d 553, 557 (5th Cir. 1982).

Here, Defendants contend that the State of Mississippi is entitled to sovereign immunity and that the University and Board, as arms of the state, are similarly entitled to such immunity. Plaintiff provides no argument otherwise in his response. Indeed, the Fifth Circuit has previously articulated that both the University of Mississippi and Board of Trustees are arms of the State of Mississippi for purposes of sovereign immunity. See Kermode, 496 F. App'x at 488 (reaffirming the Fifth Circuit's position that the University of Mississippi is an arm of the state); Jagnandan v. Giles, 538 F.2d 1166, 1174-76 (5th Cir. 1976) (noting that the State is "inextricably involved in all facets" of University operation and pointing out that state law confirms that "the Board and [Mississippi State University] are part and parcel of the state"). Accordingly, this Court finds no reason to differentiate from that holding here and determines that the State of Mississippi is entitled to sovereign immunity and that both the Board and the University, as arms of the state, are equally entitled to raise the defense of sovereign immunity. As such, this Court has no jurisdiction to entertain Plaintiff's claims against those parties.

Moreover, Defendants likewise contend that Defendant Dan Jones, as an agent of the State sued in his official capacity, is also entitled to sovereign immunity. As clearly established in this circuit, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and is thus also subject to the defense of sovereign immunity. Union Pac. Ry. Co., 662 F.2d at 340 n.3 (internal quotation omitted); see also Kermode, 496 F. App'x at 488 (finding that sovereign immunity extends to "faculty administrators sued in their official capacities").

That bar from suit is qualified by a caveat, however, whereby a plaintiff may nonetheless maintain a suit for prospective injunctive relief against a state agent sued in his official capacity under Ex parte Young. Travis v. Hawkins, 381 F.3d 407, 412 (5th Cir. 2004) (internal quotation omitted) (noting that "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law"); Brennan v. Stewart, 834 F.2d 1248, 1252 (5th Cir. 1988). Under Ex parte Young, "[t]he Eleventh Amendment does not protect state officials from claims for prospective relief when it is alleged that the state officials acted in violation of federal law." Nelson v. Univ. of Tex., 535 F.3d 318, 322 (5th Cir. 2008) (internal citation omitted).

According to the Fifth Circuit, Ex parte Young "solidified the doctrine that state officers could be sued in federal court despite the Eleventh Amendment, while simultaneously emphasizing the requirements that the officers have 'some connection with the enforcement of the act' in question or be 'specifically charged with the duty to enforce the statute' and be threatening to exercise that duty." Okpalobi v. Foster, 244 F.3d 405, 415 (5th Cir. 2001) (internal quotation omitted). As such, the decision "is thus properly understood to create a precise exception to the general bar against suing states in federal fora. This exception only

applies when the named defendant state officials have some connection with the enforcement of the act and 'threaten or are about to commence proceedings' to enforce the unconstitutional act." Id. at 416; see also Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011) (explaining that "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit."). Additionally, as with all claims, the plaintiff must have standing to raise a claim under the exception. Walker v. Livingston, 381 F. App'x 477, 479 (5th Cir. 2010) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)) (holding that because plaintiffs lacked standing to assert their claims for injunctive relief, they could not pursue their claims under Ex parte Young).

This Court recently had the opportunity to consider the applicability of Ex Parte Young in a similar context. In Yul Chu v. Mississippi State University, the plaintiff was a tenure-track professor who was employed with the university for several years. 901 F. Supp. 2d 761, 769. (N.D. Miss. 2012). Id. Eventually, however, the plaintiff was denied tenure and then terminated. Id. The plaintiff filed suit against the university, the state board, the university president, and several individual state board members. Id. Finding that "neither [the Board nor the University] [was] a state official responsible for enforcing the federal law at issue", the court held both such entities protected by sovereign immunity. Id. at 775. As to the university president and other individually named defendants, however, the court concluded that "[b]ecause [p]laintiff has asserted that his termination from his position at [the university] was unlawful [as a deprivation of his procedural and substantive due process rights] and seeks injunctive relief from the named state officials, Plaintiff has alleged prospective relief for ongoing violations of federal law against those officials." Id. at 776.

In the case at hand, Defendants argue that Plaintiff's monetary claims against Defendant Jones in his official capacity are clearly barred by sovereign immunity, and that Seals has likewise failed to invoke the Ex parte Young exception with respect to any potential claims against Jones for injunctive relief. Under the law of this Circuit, claims for monetary damages levied against state officers in their official capacities are treated as suits against the state and such officers are therefore entitled to invoke the protections of sovereign immunity. Kermode, 496 F. App'x at 488 (internal citations omitted). Accordingly, this Court finds that Plaintiffs monetary claims against Jones are indeed subject to the defense of sovereign immunity and are due to be dismissed.

As to Defendants' assertion regarding Plaintiff's injunctive claims, however, Defendants have sparingly provided any case law. As such, the Court finds Defendants' argument only partially correct. Here, Plaintiff's complaint seeks as equitable relief "a mandatory [injunction] compelling the University to operate by a syllabus or some class instructive [sic] given to the student at the beginning of the course" and, as specific performance, "that [Seals] be granted the true and correct grades as set forth above." Although the Court finds that Seals lacks standing to require Jones to institute a requirement regarding syllabi, the Court allows him to proceed with his request for specific performance under Ex parte Young.

As to Plaintiff's claim for an injunction compelling the University to institute a syllabus requirement, Seals has failed to establish Article III standing. In order to maintain standing for purposes of Article III jurisdiction, a plaintiff must show: (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury. Houston Chronicle Pub. Co. v. City of League City, 488 F.3d 613, 617 (5th Cir. 2007) (citing Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). Here, Seals is no longer enrolled as a student at the University and, in fact, has already graduated with a degree. Although he is able to meet the first two requirements for Article III standing, he has failed to show how an injunction granting prospective relief will redress any injury he may have suffered, and therefore cannot maintain that claim. Walker, 381 F. App'x at 479.

As to Plaintiff's additional injunctive claim for relief, however, Seals does have Article III standing. Specifically, Seals requests that "he be granted the true and correct grades." Because Plaintiff brings his request for specific performance against Jones in his official capacity as an agent of the State and the requested relief is injunctive in nature and prospective in effect, the Court finds that it meets the Ex Parte Young exception. See Virginia Office for Protection and Advocacy v. Stewart, —U.S.—, 131 S. Ct. 1632, 1639, 179 L. Ed. 2d 675 (2011) ("[A] court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.") (internal quotation omitted); Cantu Services, Inc. v. Roberie, 535 F. App'x 342, 344 (5th Cir. 2013) (internal quotations omitted) (stating that "suit must be brought against individual persons in their official capacities as agents of the state and the relief sought must be declaratory or injunctive in nature and prospective in effect" and articulating that "claims at least on their face were for prospective relief even where whether the claims were truly for prospective declaratory or injunctive relief was uncertain"); Yul Chu, 901 F. Supp. 2d at 776.

Based on the foregoing reasoning, the Court determines that the State, the Board, and the University are entitled to sovereign immunity and all claims levied against those parties are therefore dismissed without prejudice.[3] Moreover, as to Plaintiff's claims against Jones in his

---

[3] See Warnock v. Pecos Co. Tex., 88 F. 3d 341, 343 (5th Cir. 1996) (articulating that "[b]ecause sovereign immunity deprives the court of jurisdiction," dismissal without prejudice is appropriate); see also Ramming v.

official capacity as chancellor of the University, the Court holds that Plaintiff lacks the requisite standing for his injunctive request regarding syllabi, but finds that Seals' request for specific performance meets the Ex Parte Young exception to sovereign immunity. Accordingly, the Court proceeds to the merits of Plaintiff's substantive and procedural due process claims levied against Jones.

*Constitutional Due Process Claims Against Jones and Individually Named Faculty*

Having disposed of Plaintiff's claims against the institutional Defendants, the Court next turns to Plaintiff's constitutional claims levied against Jones in his official capacity, and Jekabsons, Britson, Reysen, and Buchholz in their individual capacities. As to Jones, Plaintiff asserts both a procedural and substantive due process claim, while as to the faculty named in their individual capacities, Plaintiff alleges only substantive due process claims.

At the outset, the Court notes that the protections of both procedural and substantive due process require a constitutionally protected property or liberty interest. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 566-67, 92 S. Ct. 2701, 33 L. Ed. 2d 548; Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 222, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985). Defendants here do not contest whether Seals held a constitutionally protected interest in the case at bar. For purposes of the present analysis, the Court assumes, without deciding, that Seals held such an interest.

A. Substantive Due Process Claims Against Jones and Faculty

Because Plaintiff's substantive due process claim against Jones is derivative of his claims against the individually named professors, the Court analyzes those claims contemporaneously. Notably, Jekabsons, Britson, Reysen and Buchholz all claim they are entitled to qualified

United States, 281 F.3d 158, 161 (5th Cir. 2001) ("The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination on the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction.").

immunity. Although Plaintiff's response fails to specifically address Defendants' qualified immunity argument or further flesh out his claims against the individual professors, the Court finds that Plaintiff's response is at least colorably responsive and does not find the contention waived. See Keenan v. Tejada, 290 F.3d 252, 262 (5th Cir. 2002) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.").

Qualified immunity protects government officials from liability "to the extent that their conduct is objectively reasonable in light of clearly established law." Crostley v. Lamar Co., Tex., 717 F. 3d 410, 422 (5th Cir. 2013). The doctrine provides "immunity from suit rather than a mere defense to liability." Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 380 (5th Cir. 2005) (internal citations omitted). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id. (internal citations omitted).

Where it is raised, the plaintiff has the burden to show the inapplicability of the defense Id. (internal citations omitted). In order to do so, the Plaintiff must satisfy a two-prong test. Crostley, 717 F.3d at 422. "First, he must claim that the defendants committed a constitutional violation under current law. Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." Id. To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Club Retro, LLC v. Hilton, 568 F.3d 181, 194 (5th Cir. 2009) (internal citations omitted). Notably, however, the two requisites may be addressed in either order. Manis v. Lawson, 585 F.3d 839, 843 (5th Cir. 2009) (citing Pearson v. Callahan, 555 U.S. 223, 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

Here, as will be articulated, the Court finds that no substantive due process right has been infringed and does not proceed beyond the first prong. Consequently, Plaintiff's claims against the professors are barred by qualified immunity and his substantive due process claim against Jones fails on the merits.

Although Plaintiff's response fails to specifically resuscitate his claims against the individual Defendants, his complaint avers that each professor's conduct constituted "an arbitrary taking of his property rights in the syllabus and in the student handbook regarding grading." Further, in response to Defendants' Motion for Summary Judgment, Seals did argue that "this Court should find that Ed's interest in having the express terms of a syllabus and/or fair and proper grading warrants substantive due process protection." According to Plaintiff, "following the lead of the Supreme Court in Horowitz and Ewing, assuming, arguendo, for purposes of herein, that a constitutional right to a syllabus (therefore, express terms of the contractual relationship between the University and student as to each particularly calls) (sic) and free from arbitrary state action (grading) is implicated, this Court must conclude that Ed was treated in a manner completely devoid of reasoned academic decision making, in the absence of a syllabus." Finally, in summation, Plaintiff argued, "the lack of a syllabus leaves disavows (sic) any academic decision making and renders the same not rationally related to the University's function of educating students. The University acted arbitrarily and capriciously in violation of Ed's substantive due process rights."

In order to successfully lodge a substantive due process claim, a plaintiff must show that the government's deprivation of a property interest was "arbitrary or not reasonably related to a legitimate governmental interest." Williams v. Texas Tech. Univ. Health Sci. Ctr., 6 F.3d 290, 294 (5th Cir. 1993) (internal citation omitted). In Regents of University of Michigan v. Ewing,

474 U.S. 214, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985), the Supreme Court recognized an extremely limited and "narrow avenue for judicial review" of academic decisions under substantive due process review.

There, the Court articulated that "[w]hen judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's judgment." Id. at 225, 106 S. Ct. 507. Accordingly, "they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee did not actually exercise professional judgment. Id., 106 S. Ct. 507. The courts should remain cognizant that they are far less "suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial or administrative decisionmaking." Id., 106 S. Ct. 507 (internal quotation omitted).

According to the Fifth Circuit, Ewing stands for the proposition that courts "must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of the student's entire career at the University…'". Wheeler v. Miller, 168 F.3d 241, 250 (5th Cir. 1999). In Wheeler, the plaintiff was a disgruntled Ph.D. student who claimed that "false accusations of cheating resulted [in] inadequate grades, a punitive remediation plan, denial of participation in an internship program, and his ultimate dismissal from the program." Id. at 244. There, the plaintiff's accrual of several C's during his tenure in the graduate program and allegations regarding being late to class, sleeping during lectures, and fabricating study results led to the institution of an unusually demanding remediation program. See id. When plaintiff proved unable to comport with the

remediation program, he was formally dismissed from the program and thereafter filed suit claiming a deprivation of his right to substantive due process.  Id. at  246, 247.

In considering the plaintiff's claim, the Fifth Circuit relied heavily on Ewing, ultimately concluding that the plaintiff "[did] not come close to showing that [defendant] did not exercise professional judgment."  Id. at 250.

According to the court:

> [All] of the decisions taken by [defendant]—those regarding grades, the remediation plans, and the award of a degree—are genuine academic decisions under Ewing.  Ewing, in delineating a student's substantive due process rights, did not hold that genuine academic decisions and the standard for judicial review of such decisions are limited only to those decisions based purely on test scores or some other objective academic criteria.  It noted that the academic decision in issue might reasonably have been based on university concerns about the student's "lack of judgment and an inability to set priorities," and that the university promotion and review board "was uniquely positioned to observe [the student's] judgment, self-discipline, and ability to handle stress, and was thus especially well situated to make the necessarily subjective judgment of [his] prospects for success in the medical profession."
> Id.  (internal citation omitted).

Id. Thus, where a plaintiff attempts to challenge a genuinely academic decision on the basis of substantive due process, he need show that the disputed decision fell beyond the pale of reasoned academic decision-making such that the persons or committee responsible did not exercise professional judgment.  Id. at 250; see also Haberle v. Univ. of Alabama in Birmingham, 803 F.2d 1536, 1540 (11th Cir. 1986)  (accord).

Based on this stringent standard, Plaintiff here has plainly failed to show that Defendants did not exercise professional judgment in awarding him his disputed grades or concluding that Seals cheated on his final exam.  As to Plaintiff's grade in BISC 491, the record indicates that Seals was awarded a B after reasoned consideration, with Jekabsons reflecting that the grade was

appropriate based on his own twenty years of lab experience and conclusion that Seals exhibited "significant deficiencies in some of the benchwork." Although Seals further complains that the evaluation of his performance was subjective, the Court specifically listed the inherently subjective nature of academic decisions as a substantial justification for the need to grant academicians deference for their decisions. See Ewing, 474 U.S. at 227 n. 13, 106 S. Ct. 507 (noting that review board was "especially well situated to make the necessarily subjective judgment of [plaintiff's] prospects for success in the medical profession").

Moreover, with regard to his assigned grade in BISC 330, this Court finds no evidence that Britson exercised less than professional judgment by deducting five participation points from Seals' grade on the basis that she had observed him banging on the classroom door when he was late to class, refusing to turn in quizzes in a timely manner, and refusing to turn in his final exam after time had expired. Further, despite the fact that Seals complains he was unable to review his graded assignments throughout the semester, the Court finds that such an allegation fails to take the grade assignment beyond the pale of reasoned academic decision-making.

Additionally, as to Reysen's assigned grade of an F in PSY 420, the Court similarly finds that Seals has failed to make the requisite showing necessary to disturb a genuinely academic decision on the basis of substantive due process. Although Seals contests whether his work actually constituted plagiarism, the issue before this Court is whether Reysen exercised professional judgment in reaching that conclusion. The undisputed record before the Court shows that Reysen detected what he considered to be plagiarized material in a draft submitted by Seals. Reysen thereafter provided comment regarding necessary changes in March of 2011. When the completed thesis was submitted to Plaintiff's review committee, all three members detected instances of plagiarized material and determined that it should not be accepted.

Additionally, Samonds used an internet program to confirm that the thesis indeed contained multiple instances of plagiarized material. Accordingly, the Court finds that Plaintiff has failed to show Reysen's determination was beyond the pale of reasoned academic decision making.

Finally, in regard to Buchholz's assignment of an F in BISC 350, the Court likewise finds Plaintiff's claim insufficient. Again, although Seals argues that he was not referencing outside materials during his final exam, the question before this Court is whether Buchholz exercised professional judgment in reaching that conclusion. Based on the record before the Court, one of Seals' colleagues observed Plaintiff consulting note-cards during the exam, and reported her suspicions to Buchholz. Buchholz thereafter attempted, and in his mind did, independently confirm that third-party student's accusations. Seals has cited no evidence indicating that Buchholz's determination was outside the pale of reasoned academic decision-making. Furthermore, as to Seals' assignments which Buchholz found to contain plagiarized material, it is undisputed that Buchholz relied on an independent software program to reach such a conclusion. Seals has similarly failed to show that Buchholz's conclusion was outside the pale of reasoned academic decision-making.

Accordingly, Plaintiff's substantive due process claims fail to pass muster. Plaintiff has failed to show that any of the challenged actions were beyond the pale of reasoned academic decision making. Additionally, although Plaintiff implores this Court to ratify a constitutional syllabus requirement, Seals has proffered no authority in support of that request and this Court declines to do so. Therefore, Jekabsons, Britson, Reysen, and Buchholz are entitled to qualified immunity and Plaintiff's substantive due process claims as to Jones and the individually named faculty members are dismissed with prejudice.[4]

---

[4] See Sama v. Hannigan, 669 F.3d 585, 589 (5th Cir. 2012) (affirming dismissal with prejudice where plaintiff failed to rebut assertion of qualified immunity."); Young v. Akal, —F. Supp. 2d — , 2013 WL 6326154, at *8 n.9

B. Procedural Due Process Claim Against Jones

Plaintiff additionally brings a procedural due process claim against "the University." Because an official capacity claim against Jones is essentially, outside the fiction of Ex Parte Young, an action against the University, the Court construes those arguments as to Jones. Notably, however, Plaintiff makes no averments regarding potential procedural due process violations on the part of the individually named professors in either his complaint or response to the Motion for Summary Judgment and the Court declines to do so on his behalf. In re Cao, 619 F.3d 410, 435 (5th Cir. 2010) (noting that the role of the court is "not to create arguments for adjudication" or "raise [them] like a Phoenix from the ashes[,]" but "rather, [the court's] role is to adjudicate the arguments with which [it is] presented").

Procedural due process requires less when a student is the victim of an adverse decision in an academic context, than in a disciplinary context. Shaboon v. Duncan, 252 F.3d 722, 730 (5th Cir. 2001). Moreover, when determining whether a decision is genuinely "academic," the Fifth Circuit has endorsed a fairly broad meaning. See Wheeler, 168 F.3d at 250 (noting that an "academic" decision need not be based on "test scores or some other objective academic criteria"); Williams, 6 F.3d at 294 (finding that university's decision to reduce a professor's salary was "academic" because it was "reduced for lack of grant productivity and lack of funded grant salary support").

When making an academic decision, a university need not provide the student with a hearing before rendering a finding. Horowitz, 435 U.S. at 90, 98 S. Ct. 948 ("[W]e decline to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing."); Shaboon, 252 F.3d at 730; Ceasar v. Holt, 245 F. App'x 396, 397 (5th

_____

(W.D. La. Dec. 2, 2013) ("Dismissal of claims on grounds of qualified immunity constitutes a dismissal with prejudice.").

24

Cir. 2007) ("[Plaintiff's] submissions show that he was given notice that his academic progress was unsatisfactory and that the decision to dismiss him was careful and deliberate."). Instead, a student has certainly received all the procedural due process required where "the school fully informed [plaintiff] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment." Horowitz, 435 U.S. at 85, 98 S. Ct. 948.

Based on the present record, the Court finds that the challenged decisions were academic in nature. As such, the University was under no obligation to provide a hearing before reaching those decisions. Defendants provided Plaintiff at least as much procedural process as was required. Each grade that Plaintiff now challenges was subject to a five-level appeal process. That process allowed Plaintiff to review the decision by appealing to: the faculty member who assigned the grade, the department chair, the dean of the school, an academic appeals committee, and, finally, the vice chancellor for academic affairs. Because the Court is mindful that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint[,]" the Court finds that Seals was provided the constitutionally required procedural process. See Horowitz, 435 U.S. at 91, 98 S. Ct. 948. Accordingly, Seals' procedural due process claim as to Jones is hereby dismissed with prejudice.

*Supplemental State-Law Claims*

Having dismissed Plaintiff's federal constitutional claims on either the merits or a lack of jurisdiction, the Court must now confront Plaintiff's supplemental state law claims. Specifically, Plaintiff additionally brings Mississippi constitutional claims, state-law based contract claims, and state-law based defamation claims. In Defendants' Motion for Summary Judgment, they argue that the Court should decline to exercise supplemental jurisdiction over the remaining state

law claims.  Plaintiff fails to put forth any response except to argue that his claim for breach of contract is listed first in the complaint.  Finding that reasoning insufficient, the Court declines to exercise supplemental jurisdiction over Seals' remaining state law claims.

Under 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction over a claim if: (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  In determining whether the exercise of such jurisdiction is appropriate, the court is guided by the preceding statutory factors as well as the common law factors of judicial economy, convenience, fairness, and comity.  Mendoza v. Murphy, 532 F.3d 342, 346 (5th Cir. 2008). According to the Fifth Circuit, although "[t]he general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial . . . this rule is neither mandatory nor absolute." Brookshire Bros. Holding, Inc., v. Dayco Prod. Inc., 554 F.3d 595, 602 (5th Cir. 2009).

Notably, the court has consistently held that declining supplemental jurisdiction following a significant investment of judicial resources in the litigation constitutes an abuse of discretion.  Id. at 602.  In Brookshire, for instance, at the time the district court declined jurisdiction, the litigation in federal court had lasted more than three years,  had generated more than 1,300 entries on the docket, and the district court already had decided forty-one dispositive motions, fourteen Daubert motions, and seven other motions in limine.  Id. at 598.  Additionally, discovery had concluded and the parties had begun preparation for trial.  Id.  In reviewing the district court's decline, the Fifth Circuit held, "[o]ur case law is clear that when a district court

declines to exercise jurisdiction over remaining state law claims following the dismissal of all federal-law claims and remands a suit after investing a significant amount of judicial resources in the litigation analogous to that invested by the district court in this case, that court has abused its discretion." Id. (citing Batiste v. Island Records Inc., 179 F.3d 217, 227 (5th Cir. 1999)).

On the other hand, in Parker & Parsley Petroleum Company, the district court erred by retaining jurisdiction after the plaintiff's federal claims had been dismissed. Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 587-90 (5th Cir. 1992). There, the case had been pending approximately nine months, trial was several weeks away, discovery had not yet been completed, and there was no indication that the court was substantially familiar with the merits of the case. Id. at 587. The court therefore held that the district court abused its discretion by retaining the case in the face of the general rule that supplemental jurisdiction should not be exercised following the dismissal of all federal claims. See id. at 590.

Here, the present case has been pending a little over eighteen months, but has required little judicial interposition thus far. Additionally, although discovery is complete, the Court has dismissed a number of Plaintiff's claims on the basis of a lack of jurisdiction. Thus, the Court has no significant expertise on the particular facts of the dispute and the Plaintiff may well attempt to file those causes of action in a separate forum regardless. As such, the Court declines to depart from the norm of declining supplemental jurisdiction after all federal claims have been dismissed. See Mendoza, 532 F.3d at 346. Accordingly, Plaintiff's remaining state-law claims are hereby dismissed without prejudice.

*Motion to Reconsider Venue*

Finally, the Court additionally takes note of Plaintiff's recently filed Motion for Reconsideration of Order Granting Change of Venue [78]. In that motion, Plaintiff claims that

this Court's order entered March 19, 2013 should be revisited based on a change in the circumstances of this case. Plaintiff complains that although he did not oppose changing venue from the Greenville Division to the Oxford Division, "[n]ow . . . a new federal district judge has been assigned to Greenville and maintains an office in such division." As Plaintiff views the circumstances, "this case would have most likely been a 'duty station' case. In other words, this case would have possibly been assigned to a district judge stationed in Greenville." According to Plaintiff, "[h]aving the realignment and the Judge Brown's [sic] appointment, this case should be construed as a 'duty station' case."

Plaintiff misunderstands the nature of assigning cases in this district. Cases in the Northern District of Mississippi are assigned not on the basis of where they are filed, but by a percentage based draw. See Procedures for Assignment of Civil and Criminal Cases, Misc. Case No. 3:98-MC-19. Accordingly, the undersigned judge is randomly assigned 15% of cases filed in the Greenville Division. As articulated in Johnson v. Merchant, this is so in large part because:

> The potential for shopping for a particular judge or jury has been a matter of longstanding concern among the bench in the Northern District. The judges of this district wish to avoid the perception that one form of justice will be available to litigants filing suit in one division in this district as opposed to those filing suit in another. The judges also wish to avoid a situation whereby any particular division comes to be seen as a "fiefdom" of sorts, in which the idiosyncrasies and preferences of one judge come to dominate the local litigation practice.

628 F. Supp. 2d 695, 697 (N.D. Miss. 2009).

Even if the Court determined that a transfer of venue was now appropriate, Plaintiff would not be entitled to once again spin the wheel for his desired judge. Instead, the trial would

simply be held in Greenville.  Because the Court decides the case before trial, Plaintiff's motion is moot.

*Motions to Strike*

Having decided this case without need to reach either party's expert reports, motions to strike [59, 61, 63, 66] are rendered moot.  Notably, Plaintiff has not provided any specific citations to the report in his response to Defendant's Motion for Summary Judgment.

<u>CONCLUSION</u>

Based on the foregoing reasoning, the Court hereby decides this case as follows:

A. Plaintiff's procedural due process and substantive due process claims against the State, the University, and the Board are barred by sovereign immunity and are dismissed without prejudice.

B. Plaintiff's procedural due process and substantive due process claims for monetary relief against Jones in his official capacity are barred by sovereign immunity and are dismissed without prejudice.

C. Plaintiff's procedural due process and substantive due process claims against Jones in his official capacity seeking an injunction requiring syllabi are dismissed without prejudice for lack of standing.

D. Plaintiff's procedural due process and substantive due process claims against Jones in his official capacity seeking amendment to his transcript are dismissed with prejudice.

E. Plaintiff's substantive due process claims against Jekabsons, Britson, Reysen, and Buchholz in their individual capacities are dismissed with prejudice on the basis of qualified immunity.

F. Plaintiff's remaining state law claims as to all parties are dismissed without prejudice based on the Court's refusal to continue to exercise supplemental jurisdiction over them.

Defendant's Motion for Summary Judgment [55] is granted, the parties' motions to strike [59, 61, 63, 66] are rendered moot, and Plaintiff's motion to reconsider [78] is found moot. Accordingly, this case is CLOSED.

SO ORDERED, this the 20th day of February, 2014.

**/s/ Sharion Aycock**
**U.S. DISTRICT JUDGE**